UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| DENNIS CHRISTIAN, ) | |
| ) | |
| Plaintiff, ) | Case No. 3:08-1025 |
| ) | Judge Trauger |
| v. ) | |
| ) | |
| DAVIDSON TRANSIT ORGANIZATION, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Pending before the court is the defendant's Motion for Summary Judgment (Docket No. 41). For the reasons discussed herein, this motion will be granted, and this case will be dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Dennis Christian is an African-American male, who, in March 2000, was hired by the defendant Davidson Transit Organization ("DTO") to drive buses for the Metropolitan Transit Authority ("MTA"), a publicly chartered metropolitan transit service provider located in Nashville, Tennessee.[1] DTO is a private, nonprofit corporation, also located in Nashville, and it is responsible for the employment of all personnel who provide public transit services in Davidson County, Tennessee through the MTA.

---

[1] Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 43 and 47) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

1

At all relevant times, the plaintiff was an "at will" employee and a member in good standing of Amalgamated Transit Union, Local 1235, which has a collective bargaining agreement with DTO. The defendant had an extensive series of policies and procedures for addressing complaints of discrimination and harassment, as outlined in detail in the CBA and in the employee handbook, of which the plaintiff received a copy at the time of orientation. The handbook also outlined DTO's other policies, including a "no exceptions" rule that bus drivers wear seatbelts while operating the bus and a "light duty" or "transitional work" policy that, as modified effective December 15, 2006, allowed employees to remain on the job following an injury, consistent with the physical limitations imposed by that injury.

This is the second dispositive motion filed by DTO in this matter. On April 6, 2009, the court granted in part and denied in part DTO's Motion to Dismiss. (Docket No. 34.) As a result of the court's decision on the Motion to Dismiss, of the six claims originally asserted by the plaintiff against DTO, only the Title VII claim, based on gender and race discrimination, remained. (*Id.*; Docket No. 33 at 12-13.)

The plaintiff's discrimination allegations, as developed through the course of this litigation, center on two areas. First, on October 4, 2005, the plaintiff, while driving an MTA bus, was involved in a fairly severe accident, in which he was thrown from his seat onto the floor of the bus, next to the door. Refuting the notion that he was not wearing a seatbelt at the time of the accident, the plaintiff told his supervisor that the seatbelt did not hold during the accident. However, the plaintiff filed a subsequent accident report stating that the bus had no mechanical defects at the time of accident.

Based on this, DTO contends that the plaintiff was dishonest and not forthcoming with

2

DTO about the seatbelt and the circumstances of the accident. Indeed, DTO investigated the accident further and tested the seatbelt, finding no mechanical defect. In light of these findings, DTO, in an October 6, 2005 letter to the plaintiff, requested that the plaintiff provide additional information and clarify his explanation for how he ended up on the floor of the bus. The plaintiff never responded and, effective October 24, 2005, the plaintiff was terminated for failing to wear a seatbelt and for falsifying reports to DTO. Through his union grievance and arbitration procedure, however, the parties agreed to reduce the plaintiff's sanction to a suspension of about six-and-one-half months, which expired on May 11, 2006.

The plaintiff claims that there was racial and gender discrimination associated with this termination/suspension sanction, because, as he claims to have learned in roughly March 2006, DTO had allowed an African-American female driver to operate a bus without a seatbelt and DTO had not suspended or discharged a Caucasian female driver who was involved in an accident that also resulted in injuries. Indeed, in March 2006, while the union grievance and arbitration process was ongoing, the plaintiff filed a charge of discrimination with the EEOC, asserting discrimination associated with his treatment following the accident.

The charge only mentioned MTA (not DTO) and, in support of the claim of gender and racial discrimination, cited these "failure to discipline" incidents, alleging that they began on October 24, 2005 and ended on February 21, 2006. (Docket No. 43 Ex. N.) In response to the charge, the EEOC issued a "right-to-sue" letter to the plaintiff on June 16, 2006. While the "right-to-sue" letter mandated that any federal litigation based on the EEOC charge be filed within 90 days of the receipt of the letter, the plaintiff did not file this action until October 21, 2008, more than two years after receipt of the letter.

3

On January 25, 2007, the plaintiff filed a second charge of discrimination, this time with the Tennessee Human Rights Commission (THRC), naming both MTA and DTO, and claiming racial, "color," gender (apparently mistakenly cited as "national origin") and disability discrimination. (Docket No. 43 Ex. O; Docket No. 47 at 5.) In this charge, while the plaintiff confusingly claimed that the earliest date of discrimination was January 11, 2007, the plaintiff again focused on the events surrounding his supposedly discriminatory termination/suspension. He re-asserted the allegations that a Caucasian female driver had been involved in a traffic accident for which there was no strong sanction and the allegation that an African-American female driver had operated her bus without a seatbelt and had not been disciplined.[2]

It was in this January 2007 charge that the second area of alleged discrimination came to light, this time involving the defendant's allegedly discriminatory treatment of the plaintiff during his "light duty" work. The plaintiff was on "light" or "transitional" duty in late 2006, following another bus accident in October 2006 that had left him injured. (Docket No. 46 at 3.) In the charge, the plaintiff alleged that he had been subject to "inhumane working cond[itions]" because, from December 15, 2006 to January 10, 2007, he had been forced to work outside, in the cold, performing "rider counts," that is, counting the number of passengers who got on and off buses.[3]

Passenger counters, including the plaintiff, counted passengers boarding and departing

---

[2] The plaintiff also added the allegation that the Caucasian driver had had a second accident, within thirty days of the first. (Docket No. 43 Ex. O.)

[3] The plaintiff had also performed "transitional" or "light" duty work at other times in the course of his employment, working as a "schedule reloader" in 2004 and as a "passenger counter" at other times in 2006 and 2007.

4

buses at two primary MTA locations in Nashville, that is, at bus shelters A-E located at Fourth Avenue and Deaderick Street in downtown Nashville and at the corner of James Robertson Parkway and Eighth Avenue, near downtown. The Fourth Avenue location shelters were covered by large overhangs that protected passengers and others from the elements. Typically, there was only one passenger counter at each location and no supervisor was specifically assigned to monitor passenger counters. That said, any DTO supervisor could monitor a passenger counter if the supervisor was in the area, and passenger counters were required to maintain a timecard and a passenger count sheet.

Vaguely and unhelpfully citing "plaintiff's supplemental interrogatory responses," the plaintiff disputes several of the defendant's contentions regarding the working conditions during rider counts.[4] The plaintiff does not dispute, however, that he was allowed to dress appropriately for the weather and he would sit either on a bench or on a folding chair while counting passengers. The plaintiff likewise does not dispute that he could (and did) stop counting to take breaks, such as to get coffee or to go inside to make copies.

While the plaintiff claims that he was not readily allowed to use the bathroom whenever he chose, his own time records from this early January 2007 time period indicate that he did take breaks from the passenger counts to use the bathroom, and the plaintiff is unaware of any African-American employee who was disciplined for taking such breaks. (Docket No. 43 Exs. W and X.) Importantly, it is also undisputed that, while performing transitional work for DTO,

---

[4] The court did not locate substantive support for these objections in the only supplemental interrogatory responses from the plaintiff in the record, which were filed by the defendant in conjunction with briefing the Motion for Summary Judgment. (Docket No. 43 Ex. B.)

5

the plaintiff's pay, hours, benefits, title, and seniority were not reduced in any way.

The plaintiff specifically alleges that, as a "passenger counter," he was treated less favorably than two other employees. First, he alleges that a Caucasian female driver named Melissa Coleman was allowed to work inside and ride on the buses during her light duty work to avoid the inclement weather, while the plaintiff was not. It is undisputed that the plaintiff never requested permission to ride on the bus as a part of his "transitional" duty, and he was never told that he could not ride on the bus. Also, the plaintiff does not know Coleman's medical information or history, cannot remember when Coleman allegedly rode on the bus, and the plaintiff never inquired with Coleman, a supervisor, or DTO management as to why Coleman might have been riding on the bus. The plaintiff also testified in his deposition that, while he was a passenger counter, he rode on a bus to assist a new driver with the driver's route and that he was not disciplined for this.

Next, the plaintiff alleges that a Caucasian male bus driver, Charlie Gold[5], was allowed to perform this transitional work from the comfort of his parked car, while the plaintiff was not even allowed to drive his car to the "rider count" site. The plaintiff does not remember the time period in which Gold was driving his personal vehicle to the rider count sites, but he believes it occurred during the summer of 2006 or 2007. (Docket No. 43 Ex. A at 119.) The plaintiff was, again, not privy to Gold's medical information, never requested that he be allowed to bring his personal vehicle to the rider count sites, and he never had a conversation with a supervisor about why Gold was allowed to use his personal vehicle in this manner.

---

[5] The defendant contends that there has not been a DTO employee by that name. (Docket No. 47 at 25.)

6

Case 3:08-cv-01025  Document 49  Filed 12/07/09  Page 6 of 17 PageID #: 598

On February 20, 2007, Edward Oliphant, the defendant's Equal Employment Officer, sent the plaintiff a letter requesting additional information about his January 2007 charge. In response, the plaintiff wrote to Oliphant, "I Mr. Dennis Christian I'm writing to tell you I have been DISCRIMINATED against. Because I was asked to go downtown, while I was on light duty. And I know for sure there was a white female who was told to work on the inside to do paper work. I feel because she was a female (white). I was told to work outside as a checker she was told to work on the inside. Therefore I believe I am working in a HOSTILE ENVIRONMENT." (Docket No. 47 at 27; Docket No. 43 Ex. R.) Oliphant requested additional information from the plaintiff, including the name of the Caucasian female. But when, after a few weeks, Oliphant did not hear from the plaintiff again, he concluded that there was no discrimination, harassment or preferential treatment in the assignment of transitional work, although he alerted the plaintiff that the plaintiff was free to file future claims and that there should be no fear of retaliation for doing so.

On July 31, 2008, the plaintiff received his "right-to-sue" letter from the EEOC based on the January 2007 charge. As indicated above, the plaintiff filed this lawsuit on October 21, 2008, within the 90-day filing window established by that letter. (Docket No. 43 Ex. P.)

## ANALYSIS

The remaining claim in this case is asserted by the plaintiff against his employer under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and is rooted in claims of racial and gender discrimination.[6] The defendant has filed a Motion for Summary Judgment on

---

[6] In his response to the defendant's Motion for Summary Judgment, the plaintiff references a hostile work environment claim and a "parallel" Tennessee Human Rights Act (THRA) claim. (Docket No. 46 at 6, 8.) To the extent that the plaintiff attempts to assert a

7

this claim, arguing, among other things, that the plaintiff is procedurally barred from asserting discrimination claims arising out of the October 2005 accident, and that the plaintiff cannot establish a *prima facie* case of discrimination as to the claims arising out of the plaintiff's "light duty" work.

I.      **Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir.

---

THRA claim, this attempt is rejected, as no such claim was heretofore asserted. As to the hostile work environment claim, the court dismissed this claim at the Motion to Dismiss stage, as the plaintiff's Complaint offered no factual allegations to support that claim. (Docket No. 33 at 12.) The plaintiff never sought to amend his Complaint or to challenge the court's ruling on that point, and, therefore, the attempt to argue a hostile work environment claim here is likewise rejected, and the court will not consider arguments based on the purported existence of that claim. (*See e.g.* Docket No. 47 at 7-8.)

8

2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II.  Plaintiff's Title VII Claim

As noted above, the defendant makes two primary arguments in support of its Motion for Summary Judgment on the remaining claim in this case: (1) that at least the portion of the plaintiff's Title VII claim that arises out of the October 2005 accident fails because the plaintiff did not timely file suit after receiving his July 2006 right-to-sue letter from the EEOC (and the plaintiff cannot "revive" those claims in the second, January 2007 charge) and (2) that the

9

portion of the plaintiff's claim that arises out of the "light duty" assignment fails upon application of the well-known *McDonnell Douglas* burden-shifting framework that is applied to Title VII actions.

### A. The Allegations Arising From the October 2005 Accident

It is well established that, in order to gain the protections of Title VII, the plaintiff must exhaust his administrative remedies, that is, he must timely file a charge of discrimination setting forth the facts and the nature of the discrimination and, after receiving a "right-to-sue" letter from the EEOC, he must file suit on that charge within 90 days. *See* 42 U.S.C. § 2000e-5(f)(1); *Ang v. Proctor & Gamble Co.*, 932 F.2d 540, 545 (6th Cir. 1991). A charge is "timely" filed if it is filed with the EEOC within 180 days of the alleged unlawful practice or within 300 days if the plaintiff initiated proceedings with a state or local agency. 42 U.S.C. § 2000e-5(e)(1). These procedural requirements, including the 90-day lawsuit filing window, are strictly enforced. *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 557 (6th Cir. 2000).

As to the allegations of gender and racial discrimination arising out of the October 2005 accident that are stated in the March 2006 EEOC charge, the defendant argues that, because the plaintiff obviously filed this Complaint well after the 90-day filing period established by the July 2006 "right-to-sue" letter, allegations stemming from that charge are time-barred. (Docket No. 42 at 4-5.)

The defendant also argues that the plaintiff's allegations arising out of the October 2005 accident cannot be saved by the January 2007 THRC charge.[7] (*Id.* at 5.) Primarily, however, the

---

[7] For instance, the defendant argues that, because the plaintiff did not mention the January 2007 charge in the Complaint, and, somewhat confusingly, stated in his deposition that he did not sue on the January 2007 charge, he cannot bring litigation based on that charge.

defendant argues that the "plaintiff is barred from reasserting the same discrete act that prompted his March 2006 charge in the January 2007 charge." (*Id.*) In support of this view, the defendant cites numerous cases that hold, in essence, "plaintiff's claims involving [Title VII] discrimination [that] arose during the period covered by his first charge of discrimination d[o] not survive the expiration of his right to sue on that charge, nor may these claims be revived by plaintiff's subsequent filing with the EEOC." *Adams v. Tenn. Dept. of Fin. and Admin.*, 2004 WL 5187632, *7 (M.D. Tenn May 20, 2004)(Campbell, J); *see also Hananiya v. City of Memphis*, 356 F. Supp. 2d 871, 874-76 (W.D. Tenn. 2005); *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir. 2004).

In response, the plaintiff argues that the claims arising out of the October 2005 accident are not time-barred. (Docket No. 46 at 7.) In support of this argument, the plaintiff, weakly and confusingly to be sure, argues that DTO's conduct was part of a long-term pattern and that the court "could," therefore, consider "Plaintiff's March 2006 charge as part of an ongoing" or "continuing violation." (*Id.* at 7-8.) As to the July 2006 charge, this is clearly an unavailing

---

(Docket No. 42 at 7.) These arguments are not particularly compelling. The defendant cites no law stating that the plaintiff must identify, in his Complaint, the specific charge sued upon in order to maintain a Title VII action, and the court puts little weight on the plaintiff's confused deposition testimony, particularly because the plaintiff has obviously sued upon the allegations in the January 2007 charge, explicitly mentioning the allegedly disparate treatment of light duty employees in the Complaint. (Docket No. 1 at 7-8.) The defendant also argues that, as to the allegations stemming from the October 2005 accident, the plaintiff was tardy in filing the January 2007 charge, because it was filed more than 300 days after the last discriminatory act. (Docket No. 42 at 6); *see also Hananiya v. City of Memphis*, 356 F. Supp. 2d 871, 874 (W.D. Tenn. 2005)("In Tennessee, a plaintiff must file an EEOC charge within 300 days from the date of the last discriminatory action."). It is not necessary to reach this issue in light of the discussion above, which plainly shows that these allegations are procedurally barred and are also not viable on the merits.

11

argument; the EEOC charge established that the plaintiff had 90 days to file suit on the clearly discrete acts about which he was complaining, and the plaintiff did not file suit within the appropriate time period.

Also, the plaintiff's attempt to revive these allegations in the January 2007 charge fails. Under the clear case law discussed above, a party is not permitted to file a second discrimination charge in order to preserve claims that would otherwise be barred because they were not timely sued upon. Therefore, the discrimination allegations arising out of the October 2005 accident are procedurally barred.

Moreover, even if these claims were not procedurally barred, they would clearly fail on the merits. Under the well-known *McDonnell Douglas* burden-shifting framework (discussed in more detail below), if the defendant can articulate a legitimate, non-discriminatory and non-pretextual reason for the discipline or sanction at issue, and the plaintiff cannot establish pretext, the plaintiff's Title VII claim fails. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981). Here, as discussed in the factual section, the plaintiff received the strong sanction of termination (reduced to a long-term suspension) not simply because he had an accident and did not wear a seatbelt but also because DTO perceived, with a strong factual basis, that he was dishonest about the accident. The plaintiff has come forward with absolutely no evidence that the articulated, legitimate explanation for the strong sanction here was pretextual, and, therefore, the plaintiff's claims arising out of the October 2005 accident fail both procedurally and on the merits.

### B. Allegations Regarding Light Duty Assignments

The defendant's arguments here largely focus on the merits of the plaintiff's claim under

the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, where, as here, there is no direct evidence of discrimination, the plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp*, 411 U.S. at 802. If the plaintiff establishes his *prima facie* case, the defendant may offer a legitimate, non-discriminatory reason for the employment action, which the plaintiff may rebut with evidence that the explanation is pretextual. *Burdine*, 450 U.S. at 255-56. The burden to prove that he was a victim of intentional discrimination always remains with the plaintiff. *Id.*

To establish the *prima facie* case, the plaintiff must establish that: (1) he belongs to a protected group; (2) he was qualified for the position; (3) he suffered an adverse employment action, and (4) he was replaced by somebody outside of his protected group or the employer treated similarly situated employees outside of the claimant's protected group more favorably. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). The defendant argues that the plaintiff cannot establish the *prima facie* case as to the light duty assignments because, in being assigned to "light duty" work, the plaintiff did not suffer an adverse employment action. (Docket No. 42 at 8.)

For Title VII purposes, an "adverse employment action" is "a materially adverse change in the terms or conditions of employment because of the employer's conduct." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 185 (6th Cir. 2005)(internal quotation omitted). An "adverse employment action" will usually require a change in job position or status that is "more disruptive than a mere inconvenience or an alteration of job responsibilities" and "the Sixth Circuit has consistently held that *de minimis* employment actions are not materially adverse and,

13

thus, not actionable." *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885-86 (6th Cir. 1996)(internal quotation omitted); *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000).

Therefore, disparate treatment, if it arises in the context of a non-adverse employment action, is not actionable. *Id.*; *see also Laurence v. Gateway Health Sys.*, 2008 WL 2097390, *6 (M.D. Tenn. May 16, 2008)(Campbell, J). Also, while every case must be judged on its own circumstances, "[r]eassignments," particularly temporary ones, "without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions." *Policastro v. Northwest Airlines*, 297 F.3d 535, 539 (6th Cir. 2002); *see also Bowman*, 220 F.3d at 462.

It is undisputed here that the plaintiff saw no change in his hourly pay, benefits, title, seniority, or work hours as a result of being placed on light duty. While the plaintiff's job role obviously changed from bus driver to passenger counter while on light duty, this change was not the result of a demotion or demerit, but was, instead, necessitated by the plaintiff's involvement in a bus accident that left him unable to perform his normal job functions. Nor were the conditions of this work rigorous or arduous to a degree that a reasonable person would refer to the temporary transition from bus driver to passenger counter as materially adverse.

Indeed, while the Complaint painted a very bleak picture of "passenger counting" for DTO[8], discovery has shown that those representations were not accurate. As discussed above, it is now clear (and for the most part undisputed) that the plaintiff could sit and eat while he worked, could dress appropriately for the weather, and could take breaks for the bathroom,

---

[8] For instance, the Complaint alleged that disfavored "light duty" employees, such as the plaintiff, worked in "inclement weather without relief, access to food, breaks or restrooms as required by OSHA." (Docket No. 1 at 8.)

14

copying and for coffee. The plaintiff offers no substantive argument to counter the persuasive argument advanced by the defendant here, and, to the court, a reasonable jury could not conclude that the plaintiff's medically necessitated, temporary shift from bus driver to passenger counter was an "adverse employment action." Therefore, the plaintiff's Title VII claim fails as to the light duty claims.[9]

As neither of the plaintiff's remaining theories of relief under Title VII are viable as a matter of law, the defendant is entitled to summary judgment on this remaining claim.

**C. Attorneys' Fees**

The defendant also seeks its attorneys' fees and costs in connection with defending this litigation. (Docket No. 42 at 18; Docket No. 48 at 8.) Making no formal motion and providing no supporting case law, the defendant simply requests these fees at the conclusion of its briefing materials. (*See id.*)

As in any such case, the defendant may submit a Bill of Costs to the Clerk of Court pursuant to Federal Rule of Civil Procedure 54(d)(1). As to attorneys' fees, in the Title VII civil rights action context, courts may "award attorneys' fees to a defendant only where a plaintiff's claims are unreasonable, frivolous, groundless or vexatious." *Yinger v. City of Dearborn*, 1997

---

[9]It is also worth noting that the plaintiff would have substantial difficulty establishing other elements of the Title VII claim here. As to Melissa Coleman, the female bus driver who apparently was inside and/or on the bus during parts of her light duty assignment, the plaintiff has not shown that she received more favorable treatment than he did, as it is undisputed that the plaintiff also worked inside making copies, and, at least once, rode on the bus during his light duty work. Moreover, it is also undisputed that the plaintiff was never prohibited from riding on the bus during his light duty work. Also, as to "Charlie Gold," the Caucasian male bus driver who allegedly was allowed to work from his car, the plaintiff has provided nothing in the way of information about Mr. Gold's medical circumstances or any evidence that any decisions that were made as to Mr. Gold and the plaintiff were racially motivated.

15

WL 735323, *5 (6th Cir. Nov. 18, 1997). The Sixth Circuit has also noted that "an award of attorney fees against a losing plaintiff in a civil rights action is an extreme sanction, and must be limited to truly egregious cases of misconduct." *Tahfs v. Proctor*, 316 F.3d 584, 596 (6th Cir. 2003)(internal quotation omitted). The court is also not to engage in "post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." *Id.*

While discovery and briefing have shown that the plaintiff's claims are without merit and the court is somewhat troubled by the factual disparity between the Complaint allegations and the now undisputed facts regarding the conditions of "light duty" work, the court cannot conclude, on this record, that this is the type of "extreme" case that warrants the sanction of attorneys' fees against the plaintiff. For instance, there is no indication from the record that the plaintiff or his counsel engaged in vexatious tactics throughout this litigation, and there is nothing before the court to indicate that the plaintiff did not actually believe that he had been treated less favorably than similarly situated peers of a different race and/or gender. Therefore, while the court believes that this case was not particularly close and understands the frustration and expense of defending such a case, this is not an example of the truly rare case in which a plaintiff should be sanctioned for asserting a discrimination claim.

## **CONCLUSION**

As the plaintiff's remaining claim in this case, the Title VII action, is without merit, the court will grant the defendant's Motion for Summary Judgment and will dismiss this case.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

17